S. LANE TUCKER
United States Attorney

SETH M. BEAUSANG
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: seth.beausang@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) No. <br> vs. ) <br> ) <br> APPROXIMATELY 189 FIREARMS ) <br> SEIZED FROM GATOR GUNS, INC., ) <br> ) <br> Defendants. ) <br> ) | |

**VERIFIED COMPLAINT FORFORFEITURE IN REM**

The United States of America, by its attorneys, alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## Nature of the Action

1. This is a civil action *in rem* to forfeit property to the United States under the provisions of 18 U.S.C. § 924(d)(1) for violations of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D).

## The Defendant *In Rem*

2. Defendant *in rem* is approximately 189 firearms seized from Gator Guns, Inc. in Kenai, Alaska, on or about May 11, 2023, pursuant to a federal search warrant in Case No. 3:23-mj-00277-KFR (D. Alaska). The specific firearms are listed in Attachment A hereto ("Defendant *in rem*").

3. Defendant *in rem* is presently in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives in the District of Alaska.

## Jurisdiction and Venue

4. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Venue is proper in this Court under 28 U.S.C. § 1395 because the acts or omissions giving rise to the forfeiture occurred, at least in part in the District of Alaska.

## Background

6. Pursuant to 18 U.S.C. § 922(a)(1)(A), it is unlawful "for any person-- (A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."

7. Pursuant to 18 U.S.C. § 921(a)(11), a "dealer" in firearms means, among other things: "(A) any person engaged in the business of selling firearms at wholesale or retail, [and] (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms."

8. Pursuant to 18 U.S.C. § 921(a)(21), a person "engaged in the business" of dealing in firearms means:

   a. "as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms"; and

   b. "as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms."

9. Pursuant to 18 U.S.C. § 921(a)(11), the term "licensed dealer" means any dealer who is licensed under the provisions of" Title 18, U.S.C., Chapter 44.

10. On December 4, 2019, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Director of Industry Operations, issued a Notice to Revoke or Suspend License to Federal Firearms Licensee Gator Guns, Inc., which is located at 7952 Kenai Spur Highway, Kenai, AK. The owner of Gator Guns is Aaron C. HORWATH.

11. This Notice to Revoke License cited that the revocation was "premised upon willful violations of federal firearms laws and regulations". Closer examination revealed that Gator Guns, Inc., specifically Aaron C. HORWATH, had at least three hundred twenty-one (321) firearms for which their disposition was not recorded, and for which the licensee could not account for.

12. On January 9, 2020, ATF issued a Final Notice of Revocation to Gator Guns, Inc., specifically served to Aaron C. HORWATH. This notice officially revoked the federal firearms license previously held by Gator Guns, Inc. This revocation document instructed Gator Guns (FFL Aaron HORWATH) of the following: "After the effective date of a license denial of renewal, revocation, or suspension, you may not lawfully engage in the business of dealing in firearms. Any disposition of your firearms business inventory must comply with all applicable laws and regulations". This document was delivered via certified mail and was accepted, and signed for, by Aaron HORWATH.

13. On April 9, 2021, ATF received a report that Gator Guns, Inc., specifically the owner Aaron HORWATH, reopened his business in the fall of 2020, and has continued to sell firearms to the public, as well as conducting gunsmithing work on customer's firearms. ATF began a general investigation into these claims.

15. During a three-day period, from April 28, 2021, to April 30, 2021, ATF agent(s) conducted four (4) spot checks on Gator Guns, located at 7952 Kenai Spur Highway, Kenai, AK. During these spot checks agents noticed only one vehicle parked in front of the business, a silver 2013 Toyota Highlander. This vehicle is registered to Aaron C. HORWATH, who was the listed FFL for Gator Guns.

16. On October 20, 2021, ATF agent(s) drove by Gator Guns, Inc. and observed HORWATH's vehicle parked in front of the business. Agents noted that the lights were on inside of the business, and there was an "Open" sign posted at the front of the business.

17. On November 5, 2021, at approximately 1400 hours, an Alaska State Trooper conducted a brief surveillance of Gator Guns to ascertain if they appeared to be open for business. The officer noted that the business did, in fact, appear to be open. Furthermore, the officer observed three vehicles to be parked directing in front of the business, including Aaron HORWATH's Toyota Highlander.

18. On November 15, 2021, at approximately 1204 hours, an Alaska State Trooper conducted a brief surveillance of Gator Guns to ascertain if they appeared to be open for business. The officer observed three vehicles to be parked in front of the business, including Aaron HORWATH's Toyota Highlander.

20. On February 23, 2022, at approximately 1437 hours, ATF agent(s) conducted a brief surveillance on Gator Guns, Inc. and observed two vehicles to be parked in front of the business, including Aaron HORWATH's Toyota Highlander.

Agents also observed that the business parking lot had recently been maintained and plowed to clear away recent snowfall. Additionally, ATF agent(s) noted that the lights were on inside of the business, and that there was an "Open" sign displayed immediately adjacent to the front door of the business.

21. On March 30, 2022, at approximately 2045 hours, ATF agent(s) conducted a brief surveillance of Gator Guns. and observed that the business appeared to be closed. There were not any cars in the parking lot, there were not any lights on inside of the business, and there was a "Closed" sign displayed immediately adjacent to the front door of the business.

22. On March 31, 2022, at approximately 0922 hours, ATF agent(s) again initiated surveillance of the business and observed Aaron HORWATH's silver Toyota Highlander parked in front of the business.

23. On March 31, 2022, at approximately 0955 hours, ATF agent(s) observed Aaron HORWATH, who is the owner of the business, to exit the store via the front door, and to turn around the "Closed" sign which was located immediately adjacent to the front door so that it now displayed "Open". HORWATH then went back inside of the business.

24. On March 31, 2022, at approximately 1129 hours, ATF agent(s) observed a vehicle to arrive at the business. The driver of this vehicle went inside of the business. Approximately six (6) minutes later, at 1135 hours, the same person exited the business carrying a small case, placed it inside of his vehicle, and departed the store.

25. On March 31, 2022, at approximately 1144 hours, ATF agent(s) observed a vehicle to arrive at the business. Two white male occupants exited the truck and went

inside of the business. Approximately nine (9) minutes later, at 1153 hours, both white males exited the business, got into the white truck, and departed the area. They were not observed carrying any items.

26. On March 31, 2022, at approximately 1512 hours, ATF agent(s) conducted a spot check of Gator Guns and observed Aaron HORWATH's silver Toyota Highlander to be parked in front of the business.

27. On March 31, 2022, at approximately 1614 hours, ATF agent(s) conducted a spot check of Gator Guns and observed two vehicles to be parked in front of the business. At approximately 1652 hours ATF agent(s) observed Aaron HORWATH and the driver of the truck to both exit the business. The driver of the truck was carrying a rifle case and placed the rifle case into his truck and departed the area. At the same time this truck departed the area, ATF agent(s) observed the owner of the business, Aaron HORWATH, walk over to the "Open" sign located next to the front door and turn the sign around so that it displayed "Closed" to the public. HORWATH then went back inside of the business.

28. On August 10, 2022, at approximately 1539 hours, ATF agent(s) conducted a spot check of the Gator Guns storefront and observed HORWATH's silver Toyota Highlander to be parked in the parking lot. ATF agent(s) also observed that there was an "Open" sign displayed immediately adjacent to the front door of the business.

29. On August 10, 2022, at approximately 1603 hours, ATF agent(s) observed the owner of the business, Aaron HORWATH, exit the business. ATF agent(s) then observed HORWATH, walk over to the "Open" sign located next to the front door, and

turn the sign around so that it displayed "Closed" to the public. HORWATH then went back inside of the business.

30. On August 10, 2022, at approximately 1606 hours, ATF agent(s) observed HORWATH exit the front door of the business, lock the front door, get into his silver Toyota Highlander, and depart the area eastbound on Kenai Spur Highway.

31. On December 5, 2022, at approximately 1518 hours, ATF agent(s) initiated surveillance of the business. There was a "Open" sign prominently displayed immediately adjacent to the front door of the business. ATF agent(s) also observed Aaron HORWATH's silver Toyota Highlander to be parked in front of the business.

32. On December 5, 2022, at approximately 1541 hours, ATF agent(s) observed a vehicle arrive at the business. The driver of this truck exited his truck and entered the business. Approximately six (6) minutes later the same driver exited the business, got into his truck, and departed the area.

33. On December 5, 2022, at approximately 1556 hours, ATF agent(s) observed the owner of the business, Aaron HORWATH, exit the business. ATF agent(s) then observed HORWATH, walk over to the "Open" sign located next to the front door, and turn the sign around so that it displayed "Closed" to the public. HORWATH then went back inside of the business. A few minutes later agent(s) observed the interior lights of the business to turn off, HORWATH exit the front door of the business, lock the front door, get into his aforementioned vehicle, and depart the area eastbound on Kenai Spur Highway.

34. On December 6, 2022, ATF conducted an undercover operation to ascertain, and/or confirm, if Aaron HORWATH was, in fact, continuing to operate a business and selling firearms without a federal firearms license. An ATF agent was assigned to serve in an undercover capacity and attempt to purchase a firearm from the owner of Gator Guns, Aaron HORWATH.

35. When the Undercover Agent (UCA1) entered the store, he observed Aaron HORWATH behind the counter, wearing a light/magnifying goggles typically used for gunsmithing or other types of fine detail work. UCA1 observed that the store looked like any typical small gun shop. There were numerous items of firearms paraphernalia on the walls, a very large quantity of ammunition behind the glass counter, approximately 8-9 handguns for sale inside the glass counter/cabinet, and a wooden rack in the middle of the main area of the store that had 6-8 long guns for sale. UCA1 observed that all the firearms in the store had price tags displayed on them.

36. UCA1 engaged HORWATH in conversation and asked if he had a specific type of gun powder used for reloading ammunition. HORWATH then said, "I'm not getting anything new anymore, I'm just clearing out my inventory, I'm going to be closing it up someday, in the next six months or a year or whatever, so I won't be getting anything more in, I haven't got anything more in, in two years or so, I'm just getting rid of what I have". While HORWATH talked, UCA1 looked at handguns for sale in the glass cabinet and observed that they had price tags displayed on them.

37. UCA1 asked HORWATH about a Sig Sauer .380 caliber pistol, that had a price tag displayed with the price "$650" on it. UCA1 asked HORWATH how firm he

was on the price. HORWATH said he could go "six and a quarter ($625.00), but I can't do much less than that". UCA1 confirmed HORWATH would sell the pistol for $625.00, and told HORWATH he would purchase the firearm. HORWATH informed UCA1 that "it's cash only these days, I gotta warn you".

38. UCA1 asked HORWATH about some .375 H&H ammunition that was for sale, and HORWATH stated it was $75.00 a box. UCA1 told HORWATH he would take one box, along with the pistol, for a total of $700.00. HORWATH agreed, and UCA1 counted out $700.00 in pre-recorded ATF funds. UCA1 handed the cash to HORWATH, who accepted the money, and re-counted it.

39. At no point during this undercover contact and transaction with HORWATH did he request identification from UCA1, nor did HORWATH conduct any form of required background check before selling the firearm to UCA1.

40. UCA1 asked HORWATH how long he would remain in business. HORWATH replied, "I'll be open through the winter but I'm hoping that by spring or summer next year I'll wrap it up". UCA1 remarked that he might be back and HORWATH informed UCA1 that he was open for business "10am-4pm every day, except Sunday".

41. On December 7, 2022, ATF agent(s) conducted another undercover operation to confirm that Aaron HORWATH was, in fact, continuing to operate a business and selling firearms without a federal firearms license. An ATF agent (UCA2) was assigned to serve in an undercover capacity and attempt to purchase a firearm from the owner of Gator Guns, Aaron HORWATH.

42. On December 7, 2022, at approximately 10:29 a.m., UCA2 drove to HORWATH's business at 7952 Kenai Spur Highway. Although there was no name or typical signage on the outside of the single-story steel building, there was an "Open" sign, similar in size to a standard stop sign, to the east of the south facing entry door. Two windows also faced south into the parking area and assorted holsters, ammunition, stocks, and rifles/shotguns were clearly visible from the exterior parking area. The business was clearly associated with firearm and accessory sales based upon the displays from outside.

43. UCA2 entered the business and observed a partitioned area at the front of the store, roughly 15' x 30' in size. This area contained a wall display on the center of the north wall partition. The display contained an assortment of holsters and other firearm accessories. There was a wooden rifle rack in the center of the floor near the east wall. The rack appeared to have the ability to display 40-60 different firearms; however, there were currently only approximately six to ten (6-10) assorted rifle and shotguns displayed in this rack. There was a glass display case, doubling as a store counter along the west wall. HORWATH was seated behind the counter and greeted UCA2 was he entered. The top of the glass display case held assorted ammunition and a cash register. Directly north of the cash register was a gunsmithing area, roughly 20'x30' in size.

44. UCA2 observed seven (7) handguns in the glass display case beneath the cash register. Each of the firearms contained handwritten price tags. UCA2 commented on the sparse number of firearms for sale. HORWATH claimed he had not ordered any new firearms in the last "year or two" he has been "selling out" and "trying to retire". He claimed he previously had 300-500 firearms in stock, however, that his supply had

dwindled to the few firearms he had on display. Of the seven handguns on display, HORWATH described the models and calibers for sale. UCA2 noted one of the handguns was a Glock, Model 21, .45 caliber, S/N: HSV558. The price tag indicated the Glock was "Used". HORWATH stated it was like new and the handgun also came with a laser guide rod.

45. The price tag on the Glock indicated the sales price was $640.00. HORWATH agreed to sell the Glock to UCA2 for $620.00 and stated he only accepted cash, since he did not have a credit card machine any longer. UCA2 provided HORWATH $650.00. HORWATH, in turn, accessed his cash register and provided UCA2 $30.00 in change. HORWATH did not provide a receipt for the transaction. At no point during the audio-recorded contact and transaction with HORWATH, did he request identification from UCA2, nor did HORWATH conduct any form of background check before selling the firearm to UCA2.

46. On December 14, 2022, ATF agent(s) conducted a review of the list of the two hundred twenty-seven (227) firearms which were observed to be in Gator Guns' inventory, when inspected by ATF during an inspection in 2019.

47. ATF agent(s) discovered that the Sig Sauer, Model P238SAS, .380 caliber semi-automatic pistol, S/N- 27A061100, which was purchased by UCA1 from Aaron HORWATH during the undercover controlled purchase operation on December 6, 2022, was, in fact, one of the firearms in HORWATH's inventory during the previous ATF inspection.

48. ATF agent(s) also discovered that the Glock, Model 21, .45 caliber semiautomatic pistol, S/N-HSV558, which was purchased by UCA2 from Aaron HORWATH during the undercover controlled purchase operation on December 7, 2022, was NOT in HORWATH's inventory when inspected by ATF in 2019.

49. On March 30, 2023, ATF conducted a third undercover operation to confirm that Aaron HORWATH was, in fact, continuing to operate a business and selling firearms without a federal firearms license. UCA2 was assigned to serve in an undercover capacity and attempt to purchase a firearm from the owner of Gator Guns, Aaron HORWATH.

50. On March 30, 2023, at 1015 hours, UCA2 arrived at 7952 Kenai Spur Highway. As UCA2 entered the business he observed HORWATH working on firearms in the rear gunsmithing area. HORWATH appeared to remember UCA2 from their previous contact during the December 7, 2022 controlled purchase operation. UCA2 and HORWATH briefly spoke about the Glock pistol that UCA@ purchased during that transaction.

51. The interior sales floor area of the store was very similar to UCA2's observations during the December 7, 2022 undercover operation.

52. The glass display case, doubling as a store counter on the west wall, contained four (4) handguns and there were two to four (2-4) additional hunting-style rifles on the wall behind the glass display case. HORWATH stated he was still trying to deplete his inventory so that he could retire and move to Kodiak, Alaska. UCA noted the gunsmithing area in the rear of the store still contained racks of rifles and shotguns. These

seemed very similar to the firearms observed in December and they were not for sale. The security camera was still visible and situated above the cash register facing the entry door. All of the firearms on the floor, and in the glass display case, all had price tags displayed on them.

53. The top shelf of the glass display case contained four (4) handguns including a Ruger Redhawk, .44 Magnum, S/N- 502-93727. The price tag on the Ruger Redhawk indicated that it cost $950.00. UCA2 asked HORWATH if the transactions were still cash only, to which HORWATH confirmed, "It's cash only these days." When asked by UCA2, HORWATH agreed to include a box of Remington .44 Magnum ammunition with the sale of the revolver. He also agreed to a sale price of $900.00 for both the ammunition, and the Ruger Redhawk.

54. UCA2 provided HORWATH with $900.00 for the revolver and ammunition, and asked HORWATH if he had any new firearms inventory coming into the shop. HORWATH stated that he occasionally takes a trade-in for the store, but stated that he was trying to not take in much more inventory.

55. At no point during the undercover contact and transaction with HORWATH did he request identification from UCA2, nor did HORWATH conduct any form of background check before selling the firearm to UCA2.

56. Based upon the firearms purchased during the undercover operations, the physical observations made by law enforcement, the intelligence information gathered during this investigation, and a review of the documentation regarding the revocation of HORWATH's federal firearms license, it revealed that Aaron HORWATH appears to

have continued to operate a storefront and actively engage in the business of selling firearms and ammunition, as well as conducting gunsmithing work, without having a federal firearms license to do so.

57. On May 11, 2023, at approximately 1010 hours, ATF agent(s) arrived at Gator Guns to serve a federal search warrant in Case No. 3:23-mj-00277-KFR (D. Alaska). They observed an "Open" sign prominently displayed adjacent to the front door, and Aaron HORWATH's silver 2013 Toyota Highlander to be parked in the parking lot. The agents entered the open business and made contact with Aaron C. HORWATH. The agents informed HORWATH that law enforcement had a federal search warrant to search the business, as well as his vehicle. HORWATH, who was cooperative, was temporarily detained and escorted outside of the business for safety purposes. The personnel assigned to the entry team then made entry into the business and cleared the structure to ensure there were no additional employees, customers, nor any other people attempting to conceal their presence from law enforcement. A brief sweep of the business by the entry team confirmed that no other people were present.

58. Members of the search team made several relevant observations corroborating the fact that this was an active storefront, which was open to the public for business, which was selling firearms, ammunition, and firearms accessories to the public. A few of these observations included an entire showroom stocked with firearms, ammunition, and firearms accessories which were displayed for sale, with price tags attached. Agents also observed an operating cash register located adjacent to the display case/sales counter area which contained an unknown amount of U.S. currency. Law

enforcement also observed numerous business documents, invoices, and records, many of which bore the name "Gator Guns".

59. As a result of the lawful search of the business, ATF located, seized, and recovered a total of one hundred eighty-nine (189) firearms from inside the business, which is the Defendant *in rem*.

60. Of the one hundred eighty-nine (189) firearms recovered from the business, approximately ten (10) of those firearms were recovered from the front showroom area, including the glass display case, the gun rack in the middle of the showroom floor, and the gun rack behind the sales counter. Nine (9) of these ten (10) firearms recovered from the showroom area had price tags attached to them and were displayed for sale to the public.

61. Of the one hundred eighty-nine (189) firearms recovered from the business, approximately ninety-two (92) firearms were recovered from middle room, which was located immediately adjacent to the front showroom area. Many of the firearms recovered from Room B had claim check tags attached to them which bore the names of customers. It should be noted that many of these tags were undated, however, most appeared to be fairly old in physical appearance. This was consistent with HORWATH's claim to agents that some customers had dropped off firearms years ago and then never retrieved them.

62. Of the one hundred eighty-nine (189) firearms recovered from the business, approximately eighty-seven (87) firearms were recovered from the rear warehouse/shop room of the business. Many of the firearms recovered from Room C were partial

firearms, firearms receivers, and according to HORWATH "junk guns" which he used for parts to work on other firearms.

63. In addition to the firearms recovered from the business, agents also located, photographed, and seized business-related documents, notes, and records. More specifically, these documents included a cardboard box full of copies of ATF Form 4473s, 2020 tax return documents for Gator Guns, business invoices and receipts for firearm parts ordered by Gator Guns, utility bills in the name of Gator Guns, a handwritten note regarding the revocation of the federal firearms license for Gator Guns, handwritten ledgers and firearm inventories for various locations, handwritten firearm inventories for multiple firearms, and handwritten inventories for firearms belonging to "Gary".

## Conclusion

64. Based on the facts alleged above, there is probable cause to believe that the Defendant *in rem* is subject to civil forfeiture pursuant to 18 U.S.C. § 924(d)(1) as firearms involved in a willful violation of Title 18, U.S.C., Chapter 44.

## Request for Warrant for Arrest In Rem

65. Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant in rem pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the Defendant *in rem* pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c). Because the Defendant *in rem* is not real property and is in the government's possession, the clerk must issue the warrant. Supplemental Rule G(3)(b)(i).

## Claim for Relief

66. Plaintiff repeats and incorporates by reference the paragraphs above.

67. By the foregoing and other acts, there is probable cause to believe that the Defendant *in rem* is subject to forfeiture to the United States of America under 18 U.S.C. § 924(d)(1).

WHEREFORE, the United States of America prays that:

a. A warrant of arrest for the Defendant *in rem*, be issued;

b. That due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed;

c. That judgment declare the Defendant *in rem* to be condemned and forfeited to the United States of America for disposition according to law;

d. And that the United States of America be granted such other and further relief as this Court may deem just and equitable, together with the costs and disbursements of this action.

RESPECTFULLY SUBMITTED this 4th day of October, 2023, in Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

s/ Seth M. Beausang
SETH M. BEAUSANG
Assistant U.S. Attorney
United States of America

# VERIFICATION

      I, Jason Crump hereby verify and declare under the penalty of perjury that I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, that I have read the foregoing Verified Complaint for Forfeiture In Rem and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief, and are based upon my personal knowledge; interviews of witnesses; review of documents and other evidence; training and experience; and information received from other law enforcement officials. This complaint does not include all the facts that the ATF learned during the course of its investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

_____
Digitally signed by JASON CRUMP
Date: 2023.10.04 11:42:25 -08'00'

Jason Crump
ATF Special Agent

Declarations have the same legal force as affidavits. 28 U.S.C. § 1746